UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**WAYNE HOLT**,                                    Case No. 1:12 CV 2369

          Plaintiff,                          Judge James S. Gwin

    v.                                        REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

          Defendant.                        Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Wayne Holt seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. §§ 1383(c)(3) and 405(g). This case was referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated September 21, 2012). For the reasons given below, the undersigned recommends affirming the Commissioner's decision.

### BACKGROUND

Procedural History

On December 18, 2008, Plaintiff filed applications for SSI and DIB claiming he was disabled due to herniated discs at L4 and L5 resulting from a car accident on September 6, 2008, his alleged onset date. (Tr. 155, 158, 205). His claims were denied initially (Tr. 74, 77) and on reconsideration (Tr. 80, 83). Plaintiff then requested a hearing before an administrative law judge (ALJ) and was 30 years old when the hearing was held on September 28, 2010. (Tr. 27, 89, 140). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff

not disabled. (Tr. 21, 27).[1]

Vocational History and Reports to the Agency

Plaintiff previously worked installing carpet with a friend, stacking boxes, performing general labor, and changing oil in vehicles. (Tr. 179, 194, 206, 216, 220). In the application at issue on this appeal, Plaintiff stated he completed tenth grade in special education classes. (Tr. 210). The Cleveland Metropolitan School District submitted a letter stating it did not have copies of individual education plans (IEPs) created for Plaintiff. (Tr. 256). The district explained this could be because the records had been destroyed pursuant to district and state regulations or because Plaintiff did not receive special education services. (Tr. 256).

Plaintiff said he suffered constant severe lower back pain made worse by walking, standing, sitting, climbing, stooping, and sleeping. (Tr. 227–28). He said he could relieve his pain using heat, ice, massage, changing positions, a TENS unit, back brace, and physical therapy, but reported these measures did not always work. (Tr. 229). He also reported taking Percocet and Soma. (Tr. 252).

Medical History

On September 6, 2008, Plaintiff went to the emergency room after he was in a car accident and suffered injuries to his head and back. (Tr. 292). He was in no acute distress but suffered from mild pain, muscle spasms, and a decreased range of motion. (Tr. 292–93). Neck and back x-rays revealed degenerative joint disease at L4-5 but were otherwise normal. (Tr. 294). On September 10, 2008, x-rays showed hypolordosis and towering of the lumbar spine, along with postural

—————————————————

1. Plaintiff has applied for social security benefits multiple times. In 2005, he alleged he had been disabled since 2004 due to a shoulder injury. (Tr. 136, 140, 171). In July 2008, Plaintiff alleged he had been disabled since December 2007 due to back pain and being a slow learner, but his applications were denied. (Tr. 68, 71, 145, 148).

subluxations, but further investigation was needed due to Plaintiff's antalgic posture and discomfort. (Tr. 356). On September 11, 2008, Plaintiff complained of neck and back pain but was in no acute distress, appeared well, had a normal gait, and was independent in activities of daily living. (Tr. 296). He reported significant pain and was prescribed Percocet, after which his pain reduced. (Tr. 297).

On September 12, 2008, Plaintiff saw Dr. Edward Gabelman at Beachwood Orthopedic and Physical Medicine regarding his injuries and explained he also herniated a disc in 2006. (Tr. 321). Dr. Gabelman noted Plaintiff did not receive treatment for that injury but was given pain medication periodically when he presented to the hospital with pain flare-ups. (Tr. 321). Plaintiff said he was also injured in 2007 when 30 males jumped him as he left a store, kicking him in the back. (Tr. 321). He did not seek treatment for that injury. (Tr. 321). Additionally, Plaintiff reported he injured his neck and back in a July 2007 car accident and went to physical therapy, but the pain never completely subsided. (Tr. 321). He also reported his work involved heavy physical labor and his chiropractor "ha[d] him disabled." (Tr. 321).

Dr. Gabelman stated Plaintiff's lumbar back pain had worsened, was constant and severe, sometimes radiated into his legs, and was sometimes associated with numbness and tingling. (Tr. 321). Plaintiff was in moderate discomfort and moved in a guarded manner, with a slow and deliberate gait. (Tr. 322). His neurological examination was normal, but Plaintiff's lumbar spine examination revealed his trunk was bent forward and he suffered moderate paraspinal spasms, tenderness, and restriction of all motion. (Tr. 322). His straight leg raise test was bilaterally positive at 70 degrees. (Tr. 322). Dr. Gabelman diagnosed neck and lumbar sprains and prescribed Percocet, Flexeril, and a lumbar brace. (Tr. 322–24). He also noted Plaintiff "was felt to be disabled from

3

work until further evaluation". (Tr. 323).

Plaintiff followed up at Beachwood with Dr. Daniel Leizman on September 26, 2008, reporting Flexeril was not helpful. (Tr. 325). He was in moderate discomfort and did not seem to exaggerate his symptoms. (Tr. 326). Plaintiff's lumbar spine examination showed his trunk was bent forward, with moderate tenderness at the lumbosacral junction and severe restriction. (Tr. 326). A seated slump test exacerbated his lower back pain. (Tr. 326). X-rays showed mild degenerative disc disease at L5-S1 and straightening of the normal cervical lordotic curve, probably secondary to muscle spasm. (Tr. 466). On October 8, 2008, Dr. Leizman diagnosed sprains and displacement of lumbar intervertebral disc, prescribed a TENS unit, and continued Plaintiff's medication. (Tr. 329). Plaintiff "was felt to be disabled from work until further evaluation." (Tr. 330). When Plaintiff was instructed on proper TENS unit use, he "seem[ed] to have a good understanding of how to use the unit." (Tr. 331).

Plaintiff followed up with Dr. Leizman on October 29, 2008 and had moderate tenderness in his paraspinal musculature at the lumbosacral junction, along with severe restriction. (Tr. 333). The seated slump test bilaterally exacerbated his lower back pain. (Tr. 333). Notes indicated a lumbar spine MRI showed a right paracentral disc herniation at L4-5, bilateral frontal compressive stenosis, and transitional L5 with sacralization. (Tr. 334). Dr. Leizman ordered lumbar epidural injections and continued use of the TENS unit, lumbar bracing, and medication. (Tr. 334). Notes still indicated Plaintiff was disabled from work pending further evaluation. (Tr. 335). Plaintiff received the injections on November 4, 2008 and tolerated the procedure well. (Tr. 336). On November 18, 2008, Plaintiff was in no apparent distress but his condition was largely unchanged, and Dr. Leizman recommended he continue treatment, wean off Percocet, and attend physical therapy three times a

4

week for three weeks. (Tr. 340–41). Notes still indicated he was disabled from work. (Tr. 342).

On January 14, 2009, orthopedic surgeon Dr. Robert D. Zaas wrote to Plaintiff's chiropractor Dr. Alex Frantzis after evaluating Plaintiff. (Tr. 353). He said Plaintiff had a history of lower back pain but had not experienced much difficulty with his back prior to the accident.[2] (Tr. 353). Plaintiff told Dr. Zaas he eventually lost his job due to his inability to function. (Tr. 353). Dr. Zaas explained Plaintiff's most severe and disabling symptoms involved his lower back. (Tr. 353). He said chiropractic treatments temporarily improved mobility but Plaintiff was sometimes sore after a session. (Tr. 354).

Plaintiff was in considerable distress, uncomfortable sitting, and in worse pain if he stood. (Tr. 354). His pain was localized to the low lumbar spine and he complained of radiating pain into his hips and upper thighs. (Tr. 354). Plaintiff had widespread local tenderness from his mid-lumbar spine across the lumbosacral junction, with tenderness present even to the lightest touch at the L4-L5 levels. (Tr. 354). Forward bending, lateral tilting, and lumbar extension were all painfully guarded and Plaintiff said even the slightest movement caused a great increase in pain. (Tr. 354). Walking increased his pain and "was carried out with effort" and straight-leg raising beyond 40 to 45 degrees caused pain, but Plaintiff did not complain of weakness or sensory loss in either lower extremity. (Tr. 354). Dr. Zaas diagnosed a spraining injury to the cervical and lumbar spine, possible disc herniation in the lower lumbar spine, and history of preexisting lumbar condition aggravated by the September 2008 car accident. (Tr. 355). He noted it was difficult to locate the exact structural source

---

2. The undersigned notes Plaintiff's 2009 statement telling Dr. Zaas he "was not experiencing much difficulty with his back prior to September 6, 2008" directly contradicted Plaintiff's July 2008 application for social security benefits, in which he claimed he had experienced disabling back pain since late 2007. (*See* Tr. 68, 353).

of Plaintiff's incapacitating back pain on clinical grounds and explained he had not developed symptoms typical of radiculopathy. (Tr. 355). Dr. Zaas prescribed Percocet and Soma and advised Plaintiff to continue chiropractic treatment. (Tr. 355).

Plaintiff saw Dr. Zaas again on February 3, 2009 and was not doing very well. (Tr. 357). He thought his chiropractic treatment helped improve his mobility, but severe back pain caused him trouble standing straight and he had very limited flexion-extension on lateral movement. (Tr. 357). Plaintiff also complained of pain radiating past his hips, but not in a typical radicular pattern. (Tr. 357). He complained of midline and paraspinous pain and muscle spasms through the lower lumbar spine, and straight leg raising was slightly more limited on the right. (Tr. 357). Plaintiff could stand with his full weight on either leg without greatly increasing symptoms, but he complained of increased pain when he walked. (Tr. 357). Plaintiff wanted to see a spine surgeon to determine if he was a candidate for spine surgery. (Tr. 357). On May 18, 2009, an MRI of Plaintiff's lumbar spine revealed a herniated disc at L5-S1. (Tr. 457).

The next record from a medical doctor detailed a March 22, 2010 appointment with Dr. M.P. Patel, who noted Plaintiff reported neck pain with associated headaches, recurring shoulder pain, and constant lower back pain following a March 3, 2010 car accident. (Tr. 597). Plaintiff also reported significant difficulty walking, standing, bending, or lifting for an extended period. (Tr. 597). Examination of Plaintiff's lumbosacral spine revealed tenderness and spasms, with restricted range of motion, painful straight leg raising, and abnormal reflexes. (Tr. 598). Dr. M.P. Patel prescribed pain medications. (Tr. 598). On March 29, 2010, Dr. M.P. Patel noted Plaintiff was experiencing recurring sharp, radiating back pain. (Tr. 600). His neck, shoulders, and lumbar spine were tender, with restricted ranges of motion. (Tr. 600, 602).

6

Plaintiff returned to Dr. M.P. Patel on April 8, 2010 and reported recurring neck pain with some radiation, occasional shoulder exacerbations, and moderate recurring lower back pain aggravated with bending or lifting. (Tr. 577). Plaintiff's lumbar spine showed generalized mild tenderness and spasms, with a restricted range of motion. (Tr. 578). Dr. M.P. Patel increased Plaintiff's Soma dose and instructed him to engage in a home exercise program. (Tr. 578). On April 20, 2010, Dr. M.P. Patel noted Plaintiff had lower back tenderness, spasms, and restricted mobility. (Tr. 603). The following week, Dr. M.P. Patel noted Plaintiff complained of recurrent back pain with significant difficulty walking, standing, and climbing or descending stairs, along with episodes of numbness and tingling. (Tr. 605). He had mild-moderate tenderness in his lower back, trigger points in the paraspinal and pelvic musculature bilaterally, and his range of motion was restricted. (Tr. 605).

Plaintiff saw Dr. M.P. Patel on May 5, 2010 and complained of pain in his neck, shoulders, and lower back. (Tr. 576). He continued to have moderate recurring lower back pain and increasing discomfort when walking or standing, with occasional radiating pain and paresthesia in his legs. (Tr. 576). There was tenderness over the lumbar spinous process and paraspinous muscular masses, with spasms in the paralumbar muscles and a restricted range of motion. (Tr. 576).

On May 21, 2010, Dr. Zaas wrote to Plaintiff's chiropractor Dr. Scott Van Oosten after evaluating Plaintiff and indicated Plaintiff underwent a right L5-S1 hemilaminectomy/discectomy on June 29, 2009 to treat his prior back pain, explaining Plaintiff continued to experience pain after surgery, but "his back symptoms became markedly intensified" after the more recent car accident. (Tr. 569). Dr. Zaas said Plaintiff's pain was worse on the right side and he still experienced radiating pain into his right leg. (Tr. 569). On examination, Plaintiff could move fairly well but complained

7

of pain in his back, right hip, and right thigh as he stood from a seated position. (Tr. 570). He had a bilateral lower lumbar muscle spasm, more marked on the right side, and his straight leg raising was also more marked on the right, with mild to moderate atrophy in his right quadriceps. (Tr. 570). Plaintiff complained of diminished sensation over his right calf and foot and his right leg showed generalized weakness. (Tr. 570). Dr. Zaas diagnosed spraining injuries to Plaintiff's spine, symptomatic aggravation of preexisting post-laminectomy pain, and a spasm in the right lower lumbar spine. (Tr. 570). He could not rule out a recurrent or second-level disc herniation and opined Plaintiff's symptoms were substantially caused by the March 2010 car accident. (Tr. 570). Dr. Zaas prescribed Soma and Percocet and found the prognosis for Plaintiff's lumbar spine was guarded given his history. (Tr. 570).

Plaintiff returned to Dr. Zaas on June 15, 2010 and complained of continued and worsening back pain on both sides, with the right still more symptomatic than the left. (Tr. 572). Dr. Zaas noted Plaintiff could stand and walk with a somewhat short-strided gait without a limp. (Tr. 572). He said Plaintiff's back pain became more marked on the right side as Plaintiff remained standing, and he believed there was considerably more right-sided muscle spasm in the lower lumbar spine, along with tenderness over the midline and lower portion of the midline lumbar scar. (Tr. 572). There was also slight atrophy on the right side and straight leg raising was much more limited on the right, but Plaintiff had "surprisingly good motor power of both legs below the knees". (Tr. 572). On July 7, 2010, Plaintiff complained of radiating pain into his right calf. (Tr. 573). He also complained of increased back and leg pain when he stood and kept most of his weight on his left leg. (Tr. 573). Dr. Zaas noted predominantly right-sided lumbar muscle spasms, which painfully limited Plaintiff's range of motion. (Tr. 573). Straight leg raising was more limited on the right, with 3/8-inch atrophy

8

on Plaintiff's right thigh. (Tr. 573). However, motor power in both legs below the knees remained within normal limits. (Tr. 573).

On July 21, 2010, an MRI of Plaintiff's spine revealed a large soft-tissue process in the right lateral recess at the location of Plaintiff's previous disc herniation, which either represented fragmented disc material or scar tissue. (Tr. 574). There was no foramen compromise or thecal sac stenosis. (Tr. 574).

On August 11, 2010, Dr. Zaas saw Plaintiff and observed that Plaintiff underwent lumbar spine surgeries in June 2009 and July 2009. (Tr. 593). Plaintiff appeared to be in considerable distress. (Tr. 593). He could stand and walk but preferred to keep most of his weight on his left leg and had muscle atrophy in his right leg. (Tr. 593). He had abnormal ankle reflexes and straight leg raising was more limited on the right than the left. (Tr. 593). Plaintiff complained of tenderness and stiffness in his lower back, and attempted lumbar flexion was painfully guarded. (Tr. 593). Dr. Zaas stated Plaintiff's persisting symptoms and physical findings were consistent with post-laminectomy radiculopathy in the right lower lumbar region, symptomatic aggravation of preexisting pain and spasms related to the March 2010 car accident, and postoperative perineural scar formation versus recurrent disc herniation at right L5-S1, with associated right lumbar radiculopathy. (Tr. 594).

Chiropractic Treatment

From September 2008 until May 2009, Plaintiff saw chiropractor Dr. Alex Frantzis several times per week. Throughout treatment, Dr. Frantzis frequently noted various combinations of cervical, thoracic, lumbar, and sacral spine restrictions, tenderness, and spasms. (*See, e.g.,* Tr. 363–71, 375–84, 386–98, 402–21, 424–33, 438, 458–63, 467–75, 477–87).

Two days after Plaintiff's September 2008 car accident, Dr. Frantzis noted Plaintiff should

avoid lifting over ten pounds, repetitive bending, twisting, and standing for extended periods. (Tr. 441). Dr. Frantzis also wrote to Plaintiff's employer explaining Plaintiff could come to work when he felt ready but could not bend, twist, or lift heavy objects, and needed to take five minute breaks at least every hour to prevent aggravating his injury. (Tr. 436). He indicated Plaintiff should be on restricted duty until September 19, 2008. (Tr. 437). By October 2008, Plaintiff was starting to feel better, walked more upright, and seemed to be in less distress. (*See* Tr. 420–22). Plaintiff continued to have difficulty bending, lifting, sleeping, standing, walking, and twisting until mid-October 2008. (Tr. 416–19). However, despite occasional soreness (Tr. 394, 397, 405, 410, 416–17), Plaintiff consistently noted improvement and said he was feeling better until December 3, 2008 (Tr. 393–97, 402–26). Plaintiff regressed and had a slightly antalgic posture for several visits (Tr. 386–92), but by the end of December 2008 he was again progressing and feeling better (Tr. 382–84). He continued to improve through February 2009. (*See, e.g.,* Tr. 366–71, 375–80). In February 2009, he reported soreness and difficulty sleeping, standing, and sitting, told Dr. Frantzis his lower back pain had not improved, and at times could not perform all therapies at sessions due to discomfort. (Tr. 364–65, 481–83). From March 2009 through Plaintiff's last visit with Dr. Frantzis in May 2009, notes continued to indicate improvement (Tr. 461, 468, 471, 477–79), but Plaintiff also consistently complained of lower back pain and ultimately explained that though his neck and middle back pain no longer troubled him significantly, he had not experienced a change in his lower back pain (Tr. 458–60, 462, 467–68, 470, 472–73, 475, 480).

After his March 2010 car accident, Plaintiff treated with chiropractor Dr. Scott Van Oosten until August 2010. (Tr. 581–87). He first saw Dr. Van Oosten on March 16, 2010 and reported two prior lumbar spine surgeries, lower back pain, leg pain, and neck pain. (Tr. 581). Plaintiff's gait was

stable, his neurological examination was normal, and he had a full and painless hip range of motion. (Tr. 581). However, his cervical and lumbar ranges of motion were restricted, straight leg raising was painful, and he was very tender along his lumbar paraspinal muscles. (Tr. 581). Though he experienced some improved range of motion (Tr. 586), Plaintiff continued to experience lower back pain and tenderness and Dr. Van Oosten thought he needed to be under the care of an orthopedist because he had expected to see more improvement (Tr. 580–81). His pain was debilitating at times and affected his activities of daily living, and on August 20, 2010 Dr. Van Oosten stated he had done all he could with Plaintiff's rehabilitation. (Tr. 579, 584).

Opinion Evidence

On August 14, 2008, prior to Plaintiff's alleged onset date, Dr. Sandeep Patel stated Plaintiff suffered chronic low back pain at L4-5 and decreased spinal flexion. (Tr. 283). He noted Plaintiff had a herniated disc at L5-S1 and mild canal stenosis, but believed Plaintiff's pain was disproportionate to this condition. (Tr. 283). Additionally, Dr. S. Patel stated that while Plaintiff occasionally complained of leg radiculopathy, no clinical findings supported this condition. (Tr. 283). Though Plaintiff had decreased spinal flexion and range of motion, his gait was steady and he did not require an ambulatory aid. (Tr. 283). Dr. S. Patel noted Plaintiff had suffered back pain since January 2007 but could not seek pain management because he lacked insurance. (Tr. 283).

On September 9, 2008, state agency psychologist Suzanne Castro evaluated Plaintiff regarding a prior application in which Plaintiff alleged disability partly due to being a slow learner. (Tr. 307). She found insufficient evidence to determine whether he suffered a medically determinable severe impairment. (Tr. 307, 317). Dr. Castro noted she had not received school records and Plaintiff had not completed the form about his daily activities or contacted the office as

11

requested. (Tr. 319). She stated two things were needed to determine the functional limitations of Plaintiff's psychological allegations: a psychological consultative examination with intelligence testing, and daily activities information. (Tr. 319).

On February 9, 2009, chiropractor Dr. Frantzis filled out a form and indicated Plaintiff had pain in his lower back and tenderness to palpation. (Tr. 359). He stated Plaintiff had decreased Achilles reflex on the left, muscle spasms, decreased range of motion, could not stand much pressure, and had a slow, shuffling gait due to pain. (Tr. 359). Further, Dr. Frantzis noted Plaintiff was compliant with treatment and had improved but was restricted due to lower back pain. (Tr. 359).

On February 27, 2009, Dr. W. Jerry McCloud assessed Plaintiff's physical residual functional capacity (RFC) and found he could lift ten pounds frequently and 20 pounds occasionally; stand, walk, or sit about six hours in an eight-hour workday but had to periodically alternate sitting and standing; and was unlimited in pushing and pulling. (Tr. 445). Additionally, he found Plaintiff could never climb ladders, ropes or scaffolds and only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. (Tr. 446). Dr. McCloud found Plaintiff's statements were mostly consistent with objective medical evidence and considered them credible. (Tr. 449). Dr. Cindi Hill affirmed Dr. McCloud's assessment, finding the medical evidence supported it. (Tr. 568).

In May 2009, Dr. Zaas and Dr. Frantzis submitted forms about Plaintiff's condition. (Tr. 351–52, 454–55). Dr. Zaas stated Plaintiff suffered from lumbar and cervical sprains or strains and a herniated disc at L4-5 and was physically impaired due to aggravated lower back pain. (Tr. 351–52). Dr. Frantzis noted Plaintiff's diagnoses and said Plaintiff was consulting an orthopedic surgeon and had received ineffective spinal injections. (Tr. 454). He indicated Plaintiff felt better with therapy but still experienced severe pain and was not responding as well as expected. (Tr. 455).

12

Dr. Frantzis noted Plaintiff could not stand or walk for long periods and often found prolonged sitting bothersome due to discomfort. (Tr. 455). He also described range of motion issues and said Plaintiff was restricted from lifting heavy objects. (Tr. 455).

ALJ Hearing

At the hearing, Plaintiff's attorney argued Plaintiff met or equaled Listing 1.04 due to his spine disorder and asked the ALJ to send him for IQ testing if he was not inclined to issue a full favorable decision, arguing Plaintiff would be disabled under Listing 12.05C. (Tr. 32–34). At the end of the hearing, Plaintiff's attorney drew the ALJ's attention to Dr. Castro's note discussing the need for intelligence testing. (Tr. 60; *see* Tr. 319).

Plaintiff testified he went to school until eleventh grade and attended special education classes. (Tr. 35). He said he had trouble bending, walking, standing too long, sitting too long, and sleeping and explained it took him half an hour to get out of bed because of his constant pain. (Tr. 40). Plaintiff stated he could only relieve the pain by alternating sitting and standing. (Tr. 41). Medications decreased his pain, allowing him to put up with it, but the pain never fully went away. (Tr. 42). He said three or four times a month pain kept him awake for more than 24 hours at a time. (Tr. 43). Concerning daily activity, Plaintiff said he sat or laid on the couch watching television, might do crossword puzzles or read magazines, and did not do any housework or cooking. (Tr. 44). He also indicated difficulty dressing and told the ALJ his back was worse after the March 2010 accident. (Tr. 47).

The ALJ asked the VE to consider a person of Plaintiff's age, education, and work experience who was limited to lifting ten pounds frequently and 20 pounds occasionally, who could sit, stand, or walk for about six hours with normal breaks, and the VE testified such a person could

work as a fast food worker. (Tr. 56–57). When the ALJ modified the hypothetical to limit the person to occasionally climbing ramps or stairs, stooping, kneeling, crouching, and crawling and never climbing ladders, ropes, or scaffolds, the VE testified the person could work as a fast food worker, cleaner or housekeeper, or basic cashier. (Tr. 57–58). If the person needed to sit and stand at will, he could work as a parking lot attendant. (Tr. 58–59). None of these jobs would be eliminated if the person was limited to simple and detailed but not complex tasks, but the person would be unable to work if he needed to lay down and take unscheduled breaks such that he could not sustain a regular workday. (Tr. 59).

ALJ Decision

The ALJ found Plaintiff met the insured status requirements through December 31, 2010 and did not engage in substantial gainful activity after his alleged onset date. (Tr. 15). He then found Plaintiff suffered from the severe impairment of degenerative disc disease but found he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15–16). The ALJ noted the records did not demonstrate a medically determinable learning or intellectual functioning impairment because though Plaintiff earned poor grades, he also had poor attendance, there were no copies of IEP plans for him, there was no indication his treating sources were concerned about impaired intellectual functioning, and Plaintiff did not appear to have trouble providing information to his doctors, understanding treatment, or understanding the forms to apply for disability benefits. (Tr. 16).

The ALJ determined Plaintiff had the RFC to perform light work, except he could not climb ladder, ropes, or scaffolds and could only occasionally climb stairs or ramps, stoop, kneel, crouch,

14

or crawl. (Tr. 16). Based on VE testimony, the ALJ concluded Plaintiff could perform jobs existing in significant numbers in the national economy and therefore found him not disabled. (Tr. 20). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20

15

C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

> 1. Was the claimant engaged in a substantial gainful activity?
>
> 2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
>
> 3. Does the severe impairment meet one of the listed impairments?
>
> 4. What is claimant's residual functional capacity and can he perform past relevant work?
>
> 5. Can the claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if he satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ erred a number of ways. First, he argues the ALJ erred because he did not adequately explain why Plaintiff did not meet listing 1.04. (Doc. 13, at 7–8). Second, Plaintiff alleges the ALJ failed to properly weigh medical opinions because he rejected Dr. Zaas's opinion and did not explain what weight was given to it. (Doc. 13, at 8–10). Next, Plaintiff argues

the ALJ failed to mention some medical records other than in passing, which he contends means the ALJ failed to consider the record as a whole, requiring reversal. (Doc. 13, at 10). Plaintiff also argues the ALJ improperly evaluated his credibility and complaints of pain. (Doc. 13, at 10–11). Additionally, Plaintiff suggests the ALJ failed to conduct a full and fair hearing by not obtaining intelligence testing. (Doc. 13, at 12–14). Without explanation, Plaintiff makes a final cursory argument that the ALJ's hypothetical question failed to accurately depict all Plaintiff's limitations. (Doc. 13, at 14).

Listing 1.04

Plaintiff argues the ALJ's explanation that Plaintiff did not meet Listing 1.04 was "defective because the ALJ d[id] not provide a rationale." (Doc. 13, at 8). The ALJ explained he "specifically considered Listing 1.04" and found Plaintiff's degenerative disc disease "d[id] not approach the level of severity contemplated in this section, or any other section". (Tr. 16). As Defendant points out, Plaintiff does not contend he actually satisfied Listing 1.04, instead only challenging the ALJ's explanation. (*See* Doc. 14, at 7). The ALJ did not err. The Listings streamline the disability decision-making process by identifying people whose impairments are more severe than the statutory disability standard such that their impairments would prevent them from performing *any* gainful activity – not just substantial gainful activity – regardless of age, education, or work experience. *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (citing 20 C.F.R. § 416.925(a); Social Security Rule (SSR) 83-19, at 90). The Listings create a presumption of disability making further inquiry unnecessary. *Id.* Each Listing establishes medical criteria, and to qualify for benefits under a Listing, a claimant must prove his impairment satisfies all the Listing's specified medical criteria. 20 C.F.R. § 404.1525(d); *see also Zebley*, 493 U.S. at 530.

17

It is Plaintiff's burden to establish he met or equaled a Listing, and Plaintiff presented the Court with no argument to this effect. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). When a plaintiff fails "to offer any particularized argument to support h[is] assertion", the court will not devise arguments on his behalf. *Funk v. Astrue*, 2012 WL 1095918, *3 (N.D. Ohio 2012) (quoting *Merida v. Astrue*, 737 F. Supp. 2d 674, 679 n.2 (E.D. Ky. 2010)). Moreover, the record did not support finding Plaintiff met Listing 1.04. Listing 1.04 describes a kind of musculoskeletal impairment:

> Disorders of the spine (e.g., herniated nucleus puposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. 404, Subpt. P., App. 1, § 1.04. Substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not equal Listing 1.04. Namely, the record contained evidence of normal reflexes, negative straight leg raising tests, normal muscle strength, no weakness or sensory loss in his lower extremities, and no arachnoiditis or pseudoclaudication. (*See, e.g.,* 322, 354, 565, 573, 581–82, 585, 592, 605). The ALJ considered Listing 1.04 and found Plaintiff's degenerative disc

disease did not meet it. Considering Plaintiff's failure to argue he *did* meet it and substantial evidence showing he did *not*, the ALJ did not err at step three.

Treating Physician Rule

Plaintiff next argues the ALJ violated the treating physician rule because he failed to explain the weight given to Dr. Zaas's opinion. (Doc. 13, at 9–10). Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242. A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship –  length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's

19

opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). Good reasons are required even when the ALJ's conclusion may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows his physician has deemed him disabled and might be bewildered when told by an ALJ he is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

The ALJ summarized Dr. Zaas's treatment of Plaintiff and statements about Plaintiff's limitations. (Tr. 17–18). Specifically, the ALJ noted Plaintiff could move around well after an accident and improved, and he explained the record did not show a significant change in condition after Plaintiff's March 2010 accident. (Tr. 18). The ALJ acknowledged Plaintiff experienced pain, but found the record did not establish it was severe enough to be disabling. (Tr. 18). He then addressed a number of factors inconsistent with disability, including Plaintiff's relatively infrequent doctor visits, a doctor thinking his pain was disproportionate to his impairment, and indications he only had difficulty performing activities for extended periods. (Tr. 18). The ALJ gave great weight to the state agency opinion and Dr. S. Patel's opinion but noted Dr. S. Patel had not seen Plaintiff for quite some time. Then, the ALJ specifically stated any other contrary opinions were "of little value given the inconsistencies noted above." (Tr. 18–19).

20

The ALJ did not violate the treating physician rule. Substantial evidence supported his conclusion that as one of the "other contrary opinions", Dr. Zaas's opinion was entitled to little weight due to its inconsistencies with the record. Plaintiff had only mild degenerative disc disease. (Tr. 329, 466). He steadily improved under chiropractic care (*see* Tr. 366–71, 375–80, 382–84, 393–97, 402–22, 461, 468, 471, 477–79, 586), did not treat his condition for months after his July 2009 spinal surgery (*see, e.g.,* Tr. 357, 457–58, 581, 593, 597), frequently reported no difficulty with daily activities after October 2008 (Tr. 296, 364–71, 375–98, 402–15, 458–63, 467–96), had normal strength and neurological findings, with no sensory, motor, or reflex abnormalities (Tr. 322, 572–73, 581, 585), complained of radiating pain despite a lack of typical radicular symptoms (Tr. 283, 321, 354–55, 357), could move about fairly well (Tr. 296, 572, 593, 596), and testified medication reduced his pain up to 60 percent (Tr. 50). Further, there were several indications from doctors suggesting Plaintiff only struggled with standing or walking for extended periods. (Tr. 455, 597).

As with his previous argument, Plaintiff failed to argue how the ALJ's treatment of Dr. Zaas's opinion caused reversible error beyond claiming he failed to explain the weight given to it. But the ALJ explicitly discussed Dr. Zaas as a treating physician and specifically stated any opinions contrary to the RFC and state medical consultant opinion were of little value due to their inconsistencies. Therefore, the ALJ considered Dr. Zaas's opinion, gave it little weight as contrary to the record, and explained his good reason for doing so by citing evidence inconsistent with disabling pain. Substantial evidence supported these conclusions and the ALJ did not err.

<u>The ALJ Did Not Fail to Consider the Whole Record</u>

Plaintiff takes issue with the ALJ neglecting to mention Dr. Zaas's treatment notes from a few specific dates in 2010. (Doc. 13, at 10). These records showed Plaintiff was able to stand and

walk despite his distress and noted he might be a candidate for lumbar steroid epidural blocks (Tr. 593–94), moved about fairly well (Tr. 596), could stand and walk with a short-strided gait and no limp (Tr. 572), had "surprisingly good motor power" in both his legs (Tr. 572–73), and had a large soft tissue process at L5-S1 with impression on the dural sac but no foramen compromise or thecal sac stenosis (Tr. 574). Plaintiff argues substantial evidence did not support the ALJ's conclusion because he did not refer to these records other than in passing, but this argument fails for two reasons. First, the ALJ is not required to discuss every piece of evidence submitted, an ALJ's failure to cite specific evidence does not mean he did not consider the evidence, and the ALJ here stated he carefully considered the entire record. *Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 489 (6th Cir. 2005); (Tr. 16). Second, as even Plaintiff concedes, the ALJ did mention the exhibit containing the records Plaintiff thinks should have been considered. (Tr. 18). Moreover, when the ALJ discussed Dr. Zaas's treatment records he cited the May 2010 record stating Plaintiff could move about fairly well and the June 2010 record stating Plaintiff's right leg weakness had improved – two of the records Plaintiff contends he did not discuss. (Tr. 18). Therefore, Plaintiff's claim that the ALJ failed to mention or analyze these records is incorrect.

Evaluation of Credibility/Pain

Plaintiff argues the ALJ improperly assessed his credibility and complaints of pain and claims the Court must reverse the decision because he did not address the factors to be applied to decide whether Plaintiff suffered from disabling pain. (Doc. 13, at 10–11). The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with

22

observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

First, an ALJ determines whether there is objective medical evidence of an underlying medical condition; then, the ALJ examines whether objective evidence confirms the alleged severity of pain or the condition could reasonably be expected to produce the allegedly disabling pain. *Felisky v. Bowen*, 35, F.3d 1027, 1038–39 (6th Cir. 1994). Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

23

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

Despite Plaintiff's statement that the ALJ did not address the factors to be applied in his credibility determination, the ALJ cited 20 C.F.R. § 404.1529 and SSR 96-7p and found Plaintiff's statements about his symptoms not credible because his condition initially caused only mild or moderate pain, which improved over time; no post-surgery opinions indicated Plaintiff could not perform work; Plaintiff attended relatively few doctor appointments; and doctors only indicated he had difficulty performing activities for extended periods. (Tr. 16–18). The ALJ therefore considered several of the required factors in addressing Plaintiff's credibility – namely, Plaintiff's activities, the intensity of his pain, treatment, and doctor opinions that failed to indicate he could not perform any work.

Plaintiff does not point the Court to evidence he claims contradicts the ALJ's credibility determination. Indeed, he even said his challenge was to the legality of the decision, not the ALJ's credibility determination. (Doc. 16, at 4). Moreover, substantial evidence showed Plaintiff's complaints of disabling pain were inconsistent with numerous treatment notes indicating no difficulty with daily activities (Tr. 296, 364–71, 375–98, 402–15, 458–63, 467–96), multiple instances of Plaintiff reporting he felt better (Tr. 366, 368–69, 375, 378–80, 384, 393–94, 396–97, 403–04, 406–09, 411–12, 415, 421–22, 425, 427–28, 431–33, 435, 455, 460–61, 463, 467, 471, 474, 478–79, 481, 484–85), normal muscle strength, neurological examinations, and the ability to move around fairly well (Tr. 322, 570, 572–73, 581, 585), treating source statements indicating Plaintiff was impaired but not totally unable to work (Tr. 351–52, 359, 455), and Plaintiff's testimony that

24

medication improved his pain up to 60 percent, dulling it to the point he could tolerate it (Tr. 42, 50).

The ALJ Conducted a Full and Fair Hearing

When Plaintiff applied for SSI and DIB after his September 2008 car accident, he did not allege he was disabled due to mental impairments or discuss functional limitations from mental impairments at the hearing despite his attorney's suggestion he should be sent for IQ testing. (*See* Tr. 35, 40–52, 205). Though Plaintiff's school records showed he received extremely poor grades, there were no records of IFP plans for him and he missed 89 days of school in one year, which amounts to nearly half a school year. (Tr. 254–56); *see also* http://nces.ed.gov/surveys/pss/tables/table_15.asp. The ALJ reasonably inferred this could have affected his performance. Plaintiff's doctors never indicated concern with his mental functioning or ability to understand instructions, and evidence showed he "seem[ed] to have a good understanding of how to use" his TENS unit after instruction. (Tr. 331). Nevertheless, referring to a single notation in an assessment performed for a *different* disability application, Plaintiff insists the ALJ violated his duty to conduct a full and fair hearing by failing to obtain intelligence testing to determine whether Plaintiff's entirely undiagnosed and heretofore not asserted borderline intellectual functioning was severe. (Doc. 13, at 12–14). Plaintiff is incorrect. In this disability application, Plaintiff never alleged cognitive difficulties, the record did not establish cognitive difficulties, and at any rate the VE identified only simple, routine jobs in response to the ALJ's hypotheticals.[3] (Tr. 58–59). For those reasons, the ALJ did not err by failing to obtain intelligence testing.

---

3. Moreover, as Defendant points out, Plaintiff previously performed semi-skilled work and physical, not mental, limitations prevented him from continuing that work. (Tr. 55, 57, 353); (*see* Doc. 14, at 14–15).

25

Step 5 Argument

Plaintiff makes an extremely brief argument that the ALJ's hypothetical question failed to accurately depict all Plaintiff's functional limitations, but Plaintiff did not identify any limitation he thought should have been included. (Doc. 13, at 14). The ALJ is only required to include those limitations he finds credible, and the ALJ incorporated all credible functional limitations into his hypothetical question and RFC assessment. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."); (Tr. 56–59). Moreover, VE testimony established Plaintiff could still work even if the ALJ added a sit-stand option to the RFC and even if Plaintiff were limited to simple, routine work. (Tr. 58–59). Like the rest of Plaintiff's arguments, he baldly asserts the ALJ was wrong without ever explaining *why* he was wrong or suggesting the ultimate outcome should have been different. For that reason, and because substantial evidence supports the credible limitations incorporated into the hypothetical, the ALJ did not err at step five.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, substantial evidence supports the Commissioner's decision denying SSI. The undersigned therefore recommends affirming the Commissioner's decision.

> s/James R. Knepp, II
> United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).